## DECEMBER TERM, 1843.

### ANDREW MONTGOMERY, *et al. v.* THE COMMERCIAL BANK OF RODNEY.

By the constitution of Mississippi, " a separate superior court of chancery" is created, " with full jurisdiction in all matters of equity ;" it is provided, that "the chancellor shall be elected by the qualified electors of the whole State, for the term of six years, and shall be, at least, thirty years old at the time of his election ;" the legislature afterwards passed a law, providing for the appointment of a special chancellor, by selection of the parties litigant, or by lot, if they could not agree, to set in the trial of any case, where the chancellor, from interest or other cause, was disqualified from trying the case ; *held,* that the act of the legislature was not unconstitutional.

The statute authorizing circuit judges to grant injunctions, " within their respective circuits," limits their power to cases which have originated within the districts over which their jurisdiction extends ; and an injunction in a case originating and *to operate* beyond their districts, granted by a circuit judge, is void.

A banking corporation has power to make an assignment of its effects, for the benefit of its creditors, to trustees, and such an assignment will be upheld in equity.

The legislature of Mississippi, in the year 1840, passed an act, declaring, that "no bank in this State shall transfer, by indorsement or otherwise, any note, bill receivable, or other evidence of debt ;" *held,* that this act did not take away from a bank in failing circumstances the right to make a general assignment of its effects, for the benefit of its creditors.

*Quære.* Is not a law, 'prohibiting corporations from the performance of acts not prohibited by their charter, and not extending the prohibition to individuals, in conflict with that clause of the constitution declaring " all freemen, when they form a social compact, equal in rights ?"

THE bill, in this case, averred, that the complainants were two of the stockholders of the Commercial Bank of Rodney : that at a meeting of the stockholders, at which they were not present, and of which they had no notice, it was agreed to assign the bank to trustees for the benefit of the creditors : that the directory of the bank accordingly made such an assignment, on the 28th of March, 1843, to the defendants, Freeland and Murdock, two of the directory. By this assignment, the directory transferred to the trustees " all the stocks, bills receivable, books, judgments, accounts, mortgages, deeds of trust, claims, demands, and rights of action, as set forth in the schedule annexed " to the assignment, and, by the same assignment, conveyed all the other property of the bank, real and personal, describing the same ; and also, as well that enumerated spe-

cifically, as that not described in full : that the trustees had accepted the trust, and entered upon the discharge of their duties.

The bill charges, that the assignment was contrary to the act of the legislature prohibiting assignments on the part of banks ; was contrary to law, and was designed to defraud the stockholders and creditors of the bank : that an application for a *quo warranto*, for a supposed forfeiture of the charter of the bank, had been made to the Circuit Court of Jefferson county ; that it was in apprehension of the result of that proceeding, that the assignment had been made : that, by the assignment, the bank had ceased to be a body corporate and politic.

The bill was lengthy, and recited the terms and peculiarities of the assignment, which was, of all the effects of the bank, to pay its creditors generally ; first, however, paying the salaries of the trustees, and of their clerk.

The bill prayed for an injunction against the defendants' acting further as assignees, and for a total rescission of the deed of assignment, and other relief.

An injunction was granted by the Hon. A. G. Brown, one of the circuit judges, whose district did not embrace the county of Jefferson, in which the bank was located.

To this bill, there was a general demurrer.

[Thomas Freeland, Esq., one of the trustees, and the former president of the bank, was a near connection of the present chancellor, and the chancellor considered himself, therefore, disqualified to sit in the case : he accordingly directed that a special chancellor should be appointed, in the mode prescribed by the act of 1840. W. R. Miles, Esq., of the county of Yazoo, was selected, in the appointed manner, and presided in the trial of the case.

The constitutionality of the law under which he was appointed, was one of the questions presented for his decision. For the more perfect elucidation of the opinion, the section of the constitution, and the different acts of the legislature, referred to by Mr. Miles, in his opinion, have been subjoined.]

*George S. Yerger*, for the defendants.

This bill is one, truly, of an extraordinary character. The

complainants are two stockholders in the Rodney bank ; and, as such, they allege, that the directory called a meeting of the stockholders ; that some six or eight attended ; and that, in pursuance of a resolution made by these stockholders, the directors made a conveyance or assignment of all its property and effects, to pay its debts, to Thomas Freeland and Jno. Murdock, which, it alleges, was void. There are very extraordinary features in the bill, which will be stated, in the different points hereinafter set forth. Suffice it to say, that these two stockholders have enjoined the assignees, and all others, from paying and receiving money, collecting judgments, &c., to the amount, as alleged in the bill, of $600,000 or $700,000 dollars ; and the immense damage their injunction may occasion, is secured by a bond of $2000.

1st. I am desirous of having this case decided on the merits. The first point raised in the bill, is, that a majority of the stockholders did not direct the assignment to be made. To this, it is answered, the directory, without any directions of the stockholders, had ample power to make an assignment of all the property of the bank, to secure its debts. This point has so frequently been adjudicated, that a bare reference to the cases is sufficient.

All the cases were minutely examined, and the point decided, in the case of the Real Estate Bank of Arkansas, reported in pamphlet. Also, the recent decision of the Supreme Court of Pennsylvania, in the case of the assignment of the United States Bank of Pennsylvania ; and in the following cases : 7 Gill and Johns. 468 ; 6 ib. 205, 363 ; Angell and Ames, on Corp. 59, 64, 509 ; 6 Conn. Rep. 233 ; *Pope v. Brandon,* 2 Stew. Rep. 400 ; 5 Peters, 647.

2d. It is next insisted, that the assignment is prohibited by the 7th section of the bank act of 1840.

That section, although general in its terms, was intended merely to prohibit transfers of individual notes, so as to prevent them from being paid in the paper of the bank. It never was designed to prevent an assignment of all its property, for the payment of its debts, where that assignment stipulated, on its face (as this does), that the debtors of the institution might pay their debts in the paper of the bank.

But, if it were otherwise, the act is unconstitutional. The char-

ter, *vide* —— section, gives ample and express power to the bank to dispose of its property and effects, in any way : and if no such express power was given, it was necessarily implied.

It is by virtue of this power, that the bank has authority to make a general assignment. This power being granted by the legislature, they have no power, afterwards, to prevent its exercise. *Vide* 3 Story's Com. Con. 242, 243, 258, 259 ; *People v. Marshall,* 9 Wend. 351.

3d. It is again objected, that the bank owed State and county taxes, which were assessed before the assignment; and, that the assignment is a fraud on the State.

If this is so, the State can protect itself. If it is a fraud on the State, it is void only as to the State ; and, as these complainants are not the State, it is presumed it does them no damage.

But this is not so ; if anything is due for taxes, the assessment constituted a lien, or preference, in payment;·and the State can enforce this, notwithstanding the assignment. Act of 1841, page 59, sec. 19. It is not pretended, that the taxes shall not be paid ; no provision was made for the payment of the taxes, nor was any necessary, because the law had made it.

4th. It is next objected, that the assignees, or trustees, gave no security, nor was any required by the deed. The law does not require trustees to give security, except executors, administrators, and guardians. If the trustees are improper persons, or do acts inconsistent with thei rduty, the Court will remove them : but it does not invalidate the trust. In none of the cases cited, in the first point, was security required, except in the Arkansas case ; and in that case, the deed of assignment made it necessary, otherwise it would not have been required. A natural or artificial person may assign its property to trustees, both with or without imposing the condition, that security shall be given. If the trust is abused, the trustee will be removed.

5th. It is again objected, that the directors made two of their own body the assignees. It is not perceived why, if they have the power of making an assignment, they should not appoint one of their own body. Any person may act as trustee. The directory does not convey to the directory; they ·convey to A. B. and C. D.,

as individuals. This precise point arose in the case of *Pope* v. *Brandon*, 2 Stew. Rep. 400.

6th. It is again charged, that an information, in the nature of a *quo warranto*, was issued against said bank, to show by what warrant she exercised the right of banking ; here it charges, that the assignment to trustees was made to forestall public justice, and to avoid the consequences of a judgment of seisure.

To this novel charge, it is scarce deemed necessary to say anything. It has been heretofore considered, that an assignment made to prevent honest debts from being paid was fraudulent. But this is the first time that it has been contended, that an assignment made to pay debts was fraudulent, because a proceeding was instituted against a bank, which, if successful, would prevent it from paying its debts.

The law on this subject is, however, well settled ; all transfers and conveyances made by a corporation, before judgment of seisure, are valid.

But if there is anything in this objection, it will be high time to make it when the judgment on the *quo warranto* is given.

It may be, it never will be given. And it would be a peculiar novelty to set aside a conveyance, by a corporation, upon the ground it was intended to avoid a judgment of seisure, before such judgment of seisure was rendered.

Again, what right has a stockholder to complain ? He is not injured by it. He is benefited. If this puerile objection were available at all, it could only be taken advantage of, by those *gentlemen debtors*, who rely on the *quo warranto* as a " *new way to pay old debts.* "

But, if there were a judgment in the *quo warranto*, and the assignment was made with a view to prevent extinguishment of the debts, and to provide against it ; so far from its being fraudulent, the purpose is a just one, and will be sustained in law. That was the object of the assignment, in the case of *Pope* v. *Brandon*, 2 Stew. Rep. 401. The charter was about to expire, and the debts thereby would have been extinguished, &c. To prevent this effect the assignment was made.

*G. T. Martin*, for the complainants.

*W. R. Miles,* special Chancellor, delivered the following opinion.

This cause was submitted on motion to dissolve the injunction, for want of equity on the face of the bill. The argument at the bar rested upon the following points.

1st. The unconstitutionality of the act of 1840, providing for the appointment of a *special chancellor,* when, by reason of interest, or other cause, the chancellor is incompetent to sit.

2d. The right or power of a circuit court Judge to grant an injunction, without the limits of his own district ; and,

3d. The power of a banking corporation to make a general assignment of its assets to trustees, for the benefit of creditors since the act of 1840.

1st. I will premise, in reference to the first question, that, although the inclination of my own mind should tend most strongly to the conclusion, that the act of 1840 * is unconstitutional, I would

---

* The following is the act of 1840, referred to by Mr. Miles :

"*An act to provide for the determination of certain causes in the Superior Court of Chancery.*

" Section 1. Be it enacted by the legislature of the State of Mississippi, that in all cases depending in the Superior Court of Chancery of this State, where the chancellor is incompetent to sit by reason of interest, or for other causes, the cause or causes shall be heard and determined, as well upon final hearing as upon applications for interlocutory orders, in the following manner, to wit :

" The parties, by their counsel, shall select some member of the bar in attendance on the Court, and, in the event they do not make such selection, then it shall be the duty of the Court to designate at least four of the members of the bar in attendance as aforesaid, not of counsel interested or related to the parties, and from that number one shall be chosen by lot ; when such selection in either of the two modes aforesaid shall be made, it shall be the duty of the chancellor to retire for the time from the bench, and the said member of the bar so selected shall take his place, and hear and determine the cause or causes for which he shall have been so selected.

" Sec. 2. Be it further enacted, that in all cases and in every cause tried, heard, and determined, according to the provisions of the foregoing section, it shall be the duty of the chancellor to enter the proceedings in the Court, by virtue of this act, as if the same were had before him ; and it shall be his duty

hesitate long before so pronouncing it. The chancellor, whose place I now temporarily occupy, has repeatedly held it to be constitutional; and, unless the question was made to appear so clear, as to leave not the shadow of a doubt resting upon it, I should hardly be expected to adopt a different rule of decision.

As presented, it is a question of no little difficulty; and the most enlightened members of the profession may well entertain different opinions upon it. By* the 16th sec. of the 4th art. of the *new constitution*, it is provided, that "a separate superior *court of* chancery shall be established, with full jurisdiction in all matters of equity," &c., &c., and that "the chancellor shall be elected by the qualified electors of the whole State, for the term of six years, and shall be at least thirty years old at the time of his election." This language would seem to indicate, pretty clearly, that no one can legally occupy the chancellor's chair, unless he shall have attained the age of thirty years, and have been elected by the qual-

---

to sign all, and every, and any decree or decrees to be tendered in the cause or causes, as the same would have been signed, had the decree been rendered by him when presiding in Court; and in every other respect, the records, minutes, and proceedings, shall be and appear as if the selection provided for by this act had not been made.

"Sec. 3. Be it further enacted, that in all causes tried, heard, and determined, according to the provisions of this act, appeals and writs of error shall be granted and allowed by the chancellor, or otherwise, as by law now provided in other causes.

"Sec. 4. And be it further enacted, that this act shall commence and be in force from and after the passage thereof.

"Approved February 20, 1840."

* The following is the 16th section of the 4th article of the present constitution of Mississippi:

"A separate superior court of chancery shall be established, with full jurisdiction in all matters of equity: *provided, however,* the legislature may give to the circuit courts of each county, equity jurisdiction in all cases, where the value of the thing or amount in controversy does not exceed five hundred dollars; also, in all cases of divorce, and for the foreclosure of mortgages. The chancellor shall be elected by the qualified electors of the whole State, for the term of six years, and shall be at least thirty years old at the time of his election."

ified electors of the whole State. Yet we find, that in 1833, an act was passed, which, if constitutional, precludes the idea of indulging in such a construction.* How. & Hutch. Dig. 95, sec. 26. It is provided by this act, that " when any vacancy shall occur in any State office, the unexpired term of which does not exceed twelve months," &c., the governor may fill the same by executive appointment. Should the chancellor die, or resign, leaving an unexpired term of one year, or less, the governor is authorized to fill it by appointment. This act was passed nearly contempora-

---

* The act of 1833, is as follows :

" *An act to provide for, and prescribe the manner of, filling vacancies in public offices.*

" SECTION 1. Be it enacted by the legislature of the State of Mississippi, That all vacancies which exist at the time of the passage of this act, or which may occur before the general election in May next, in any State or county office in this State, where the officers filling the same are required by law to be commissioned by the governor, shall be filled by executive appointment; which appointment, so made, shall continue in force until the general election in May next, and until the successor or person elected to any such office, is duly qualified, and the incumbent be notified thereof, by a certificate of the person before whom the oath is administered, that the person elected has received a commission from the governor, and has taken and subscribed before him the oath of office, prescribed by the constitution.

" SEC. 2. Be it further enacted, That when any vacancy shall occur in any State office in this State, by death, resignation, removal, or otherwise, after the general election in May, 1833, when the unexpired term of the office so vacated shall not exceed one year, the same shall be filled by executive appointment; and whenever any vacancy shall occur in any such office, when the unexpired term thereof shall have more than one year to run, it shall be the duty of the governor, when notified of such vacancy or vacancies, to issue a writ or writs of election, requiring an election to be held to fill the unexpired term of said office, in the particular district, or in the State, as the case may be ; which election shall be held, in the case of filling any vacancy in the office of a district officer, on thirty days' notice ; and in the case of a State or general officer, on sixty days' notice : *provided, however,* that the governor of the State may make a temporary appointment to any office, a vacancy in which occurs, to have effect and be in force until the elections so ordered by him shall have been held, and the successor, or person elected to the office, be duly qualified, in the manner prescribed by this act."

neously with the adoption of the new constitution. In the legislature that passed it, was a large number of the delegates who framed the constitution. From that day to the present, no one has had the temerity to call in question its constitutional validity. The members of the bar, the executive of the State, the courts of justice, from lowest to highest, have all, with an unbroken unanimity, decided in favor of its constitutionality. There is scarcely a judicial post in the State, the incumbent of which has not, at some point of time since 1833, rested his claim to administer the law upon office, the tenure of which was thus obtained.

If, then, the act of 1833 be constitutional, why is not the act of 1840 ? The chancellor, who has taken his seat by virtue of an executive appointment under the act of 1833, is not elected by the qualified electors of the whole State ! any more than is the special chancellor, who takes his seat under the provisions of the act of 1840. The same rule of construction, applied to both acts, will alike render them valid or invalid.

But, again. In turning to the 4th section of the schedule appended to the new constitution, we find the following language : " All laws now in force in this State, not repugnant to this constitution, shall continue to operate, until they shall expire by their own limitation, or be altered or repealed by the legislature." It hence becomes necessary, to inquire how the law stood in relation to this matter before the adoption of the new constitution. The chancellor at that time, it is true, was not elected by the qualified electors of the whole State, but his election to office was as peremptory in its terms, and as unqualified in its results. Rev. Code, 550, sec. 6 ; 548, sec. 17 ; 84, sec. 2.* As the chancery court

---

* Sections of the law of 1821, organizing the old Chancery Court, referred to by Mr. Miles :

"CHAPTER XII.

" Sec. 2. The said Court shall have exclusive jurisdiction over all matters, pleas, and plaints, whatsoever, belonging to, or cognizable in, a court of equity: and the chancellor shall have power, either in vacation, or term time, to grant writs of injunction, to stay waste, to enjoin execution of a judgment, or to

was then established, its jurisdiction was as ample, its powers as full, and its incidents the same, as belong to it under its present organization. It will be seen, by consulting the law of that day, that whenever the chancellor was incompetent to sit in any cause, it was removed into the Supreme Court for trial and determination. Rev. Code, 86, sec. 7. The judges of that Court, under the old constitution,* had no original chancery jurisdiction. They were appointed to fill another and distinct office ; and, unless it can be made to appear, that an election and qualification to discharge the duties of one office, *ipso facto*, renders the person elected com-

---

stay proceedings at law ; to grant writs of *ne exeat*, and all other remedial writs, returnable into said Court, and properly belonging to a court of chancery, and to hear and determine the same, according to the rules of proceeding hereinafter prescribed.                                   Rev. Code, 88, sec. 2.

" SEC. 7. When the chancellor shall be interested in any cause depending in the Superior Court of Chancery, or related to either of the parties, or in any manner situated, so as to render it improper, in his judgment, to preside at the trial, it shall be the duty of the chancellor to enter upon the record the cause of such unfitness, and that he is unwilling to preside at the trial ; and thereupon such cause shall be removed into the Supreme Court, and such proceedings may be had therein as in other suits in chancery : and the said Supreme Court shall proceed to a decision thereon, and certify the same to the Superior Court of Chancery of the proper district, to be there entered as the final decree of the Court in the cause, and execution may issue thereon, as in other cases.                       Rev. Code, 86, sec. 7."

* The following are the sections of the old constitution referred to :

### " ARTICLE 4.

" SEC. 17. The appointment of all officers not otherwise directed by this constitution, shall be by the joint vote of both houses of the general assembly ; the votes shall be given *viva voce*, and recorded in the public journal of each house ; *provided*, that the general assembly be authorized to provide by law for the appointment of all inspectors, collectors, and their deputies, surveyors of highways, constables, and such other inferior officers, whose jurisdictions may be confined within the limits of the county.     Rev. Code, 548, sec. 17."

### " ARTICLE 5.

" SEC. 6. The legislature shall have power to establish a court or courts of chancery, with exclusive original equity jurisdiction ; and, until the establishment of such of court or courts, the said jurisdiction shall be vested in the superior courts respectively.                 Rev. Code, 550, sec. 6."

petent to discharge the duties of any or every other office in the State, it will be impossible to find a higher constitutional sanction for their acts, than for those of the present incumbent. They determined such causes, not as judges of the Supreme Court, but as special chancellors, under the act before cited. Rev. Code, 86, sec. 7. The question then recurs, is this act, of 1822, repugnant to the new constitution ? If it be, it is only so, because of the difference in the manner of the chancellor's election under the old and new constitutions. I apprehend, that this difference cannot be relied on, with any degree of plausibility, for the purpose of proving the act of 1822 incompatible with the mandate of the new constitution. If, then, the old Supreme Court, as a special chancery court, although it had no equity jurisdiction, except in cases of appeal, might try and determine chancery causes, under an act of the legislature ; and if that act is still in force by the 4th section of the schedule appended to the constitution ; and if, by the provisions of that act, the judges of the present Supreme Court might, as special chancellors, try and determine this cause ; why may not a member of the bar, as special chancellor, under the act of 1840, passed for a similar purpose, and containing in substance the same provisions with the act of 1822, try and determine it ? I am at a loss to perceive why he may not, unless the trappings of office, that hang around a man as judge of the Supreme Court, clothe him with powers sufficient to try causes in any and all the courts of the State.

There is another view of this question, that deserves a careful consideration. Conceding to the argument of complainant's counsel its fullest weight, it yet seems to me, that an application of an obvious rule of construction to this question, will furnish an unerring criterion by which it may be determined. In construing a grant in the federal constitution, the power sought to be exercised must be deduced from the plain and obvious meaning of the context ; or, it must be indispensably necessary for carrying into effect the expressly delegated power. But, in giving a construction to a grant in a State constitution, a rule diametrically opposite prevails ; and everything not inhibited, every power not expressly, or by necessary implication, taken away, may be exercised by the State

government.  Now, although it is declared by the new constitution, that "a separate superior court of chancery shall be created, with full jurisdiction in all matters of equity," and that " the chancellor shall be elected by the qualified electors of the whole State, for the term of six years," &c. ; yet I apprehend, this grant does not prohibit the legislature (when the chancellor from any cause is incompetent to try a particular case, depending in his court) from providing the only means, and passing the only law, that could be passed, to insure the speedy and effectual administration of justice, in this same " superior court of chancery."   Unless this construction shall obtain, the 14th section in the " Bill of Rights," will be most shamefully violated.   For how would any person, whose interest conflicted with the chancellor's, and whose rights were of an equitable character, avail himself of that grant, wherein it is said, " that all courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay," if it be not in the power of the legislature to provide some means of trying such cases ?   If the legislature has not this power, the grant in the Bill of Rights is without meaning, and it was a work of folly and supererogation, to engraft it on the charter of our rights.   I come, therefore, to the conclusion, that the act of 1840 is constitutional, and will accordingly proceed to determine the case upon its merits.

2d.  The powers of circuit court judges, in granting injunctions, have been so repeatedly limited and defined by the decisions of this Court, that I might safely rest my opinion upon them.   I will, however, refer to the statute, the positive and peremptory language of which leaves no room for doubt.   By the act it is declared, that " the judges of the said (circuit) courts, shall, within their respective circuits, have power to grant writs of injunction, and *ne exeat*, either in vacation, or term time, &c., &c.   How. & Hutch. Dig. 486, sec. 25.   This language is susceptible of but two interpretations, to wit : either that the circuit court judge, at the time he grants an injunction, must be within the limits of his district ; or the case, requiring his fiat for an injunction, must have originated within his district.   It surely need not be argued,

that the latter is the correct interpretation. A moment's reflection, upon the extent of jurisdiction conferred by the constitution and laws upon each circuit court judge, will afford a satisfactory solution of the question. Unless the act of 1841 repealed the act just cited, there can be no doubt, that the fiat in this case was granted by an incompetent person. That act declares, " that writs of injunction and *ne exeat*, orders requiring bail in chancery, &c., may be granted by any circuit judge, &c., in all cases in which, by law, the same may be properly granted. Sheet acts of 1841, 123 and 124, sec. 1. It is clear to my mind, that this act does not repeal the act of 1822 ; but simply gives the circuit court judges the right to grant injunctions and other remedial process in all cases, in which, by law, the same might be properly grantable ; and, of course, reference must be had to the law, as it existed prior to the passage of this act, in order to give it a correct construction. It is, therefore, manifest, that Judge Brown, who granted the injunction in this case, transcended his power ; and his fiat is therefore void.

3d. The power of a banking corporation to make assignments to trustees for the benefit of creditors, is a principle of law too well settled to require reference to authorities to support it. Indeed, counsel for complainant admitted its correctness at the bar ; but contended, that this principle of the general law had been limited, if not entirely repealed, by the act of 1840. See Sheet acts, 15, sec. 7. By the provisions of this act, "no bank in this State shall transfer, by indorsement or otherwise, any note, bill receivable, or other evidence, of debt ; and if it shall appear in evidence upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same was so transferred, the same shall abate, upon the plea of the defendant." To ascertain whether the construction put upon this statute of complainant's counsel be correct, I will apply some familiar rules of construction. 1st. What was the law before the passage of this act ? 2d. What was the mischief for which the law did not provide ? and, 3d. What remedy was attempted to be provided for the suppression of the existing evil ?

By the law, as it had been declared before the passage of the act

of 1840, last referred to, any of the numerous banks in this State might have transferred their notes, bills of exchange, &c. by indorsement or delivery. See *Fleckner* v. *U. S. Bank*, 8 Wheat. Rep. 335 to 363. The evil complained of was, that many of the banks, under shelter of the law thus declared, were transferring large amounts of their bills receivable, in some instances, to preferred creditors; but in many, if not in most cases, these assignments were made to nominal creditors only, for the purpose of consummating the most enormous and cunningly devised fraud upon their noteholders. This transfer of their bills receivable by the banks diminished, to an amount equal to the gross sum assigned, the legitimate fund for the redemption of their circulation. This caused a rapid and unexampled depreciation of their notes, which resulted in so much clear loss to the community ; especially, when it is recollected, that the assignees of these bills receivable refused to take the bank circulation in payment, and insisted on gold and silver. The debtors of the banks, after notice of the assignment of their liabilities, could not procure the bank notes, and plead them as sets-off. The consequence was, that the circulating medium of the State suffered a reduction, upon its nominal value, of from 50 to 90 per cent., whilst the community, who held the bank's paper, — in whose possession it had thus been caused to depreciate, and become comparatively valueless, and a large number of whom were also indebted to these same banks, — were compelled to discharge their assigned liabilities in gold and silver; and, at the same time, were. shut out from all hope of having the depreciated paper in their possession converted, upon presentation, into the constitutional currency, or its equivalent.

To remedy this evil, the legislature passed the act last referred to. To manifest more clearly, if possible, its intention, a supplemental act was passed, at the same session, declaring that all banks in this State shall, at all times, receive their respective notes at par, in liquidation of all claims due them. Sheet acts of 1840, 21 and 22, sec. 2. At a subsequent session, an act was passed, extending the benefits of the supplemental act to all persons, who should be garnisheed as debtors of any bank within this State. See Sheet acts of 1842, 140 and 141, sec. 2 and 3.

Taking, therefore, all the legislation on this subject together, it is manifest, to my mind, that the act of 1840 was never designed to operate upon or prevent such an assignment as this; but was intended alone to prevent those partial and fraudulent assignments, conceived in sin, and carried out in iniquity, the obvious tendency of which was, to depreciate and render worthless the paper of all those banks that made them, and so to diminish the fund pledged for the redemption of their circulation as to banish all hope of its ever being taken up.

But it may well be questioned, whether the act of 1840 possesses any binding or obligatory force whatever. The Supreme Court, at its last January session, in the case of *The Commercial Bank of Manchester* v. *John T. Nolan, et al.*, held that a bank is a person, artificial, it is true, but endowed with all the privileges of a natural person, except such as are expressly denied or inhibited in its charter. Now, I ask, if it be competent for the legislature, by a special act, to say that A, or A, B, and C, shall not assign or transfer any of his or their bills receivable, by indorsement or otherwise ; whilst every other man in the community is left free to do so? Would not such a law be in direct and palpable conflict with the 1st article of the "Bill of Rights," wherein it is declared, "that all freemen, when they form a social compact, are equal in rights?" If, then, a corporation possesses every power and privilege common to a natural person ; and if the charters of the banks in this State do not prohibit them from "assigning" or "transferring" their bills receivable or other evidences of debt (and they do not), I am at a loss to perceive, — until the Supreme Court shall alter its opinion, and curtail the powers and privileges of corporations, — from what source the legislature derived its power and authority to pass the act of 1840, denying to banks the right of assigning their bills receivable.

In every light which I have been able to view this question, my mind has returned, after each effort, with renewed energy to the conclusion, that the assignment to Freeland and Murdock, as trustees for the benefit of the creditors of the bank, was lawfully made; that it is such a conveyance as the contracting parties were competent to make; and is, therefore, valid in law. The injunction must, accordingly, be dissolved.